**BRD**



FILED

CLERK, U.S. DISTRICT COURT

1/21/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____GSA_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

## UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

### DIVISION: WESTERN

Case No.:

**2:26-cv-00901-DMG-(RAOx)**

ANDRAY MCWILLIAMS,

 Plaintiff,

v.

CENTROPOLIS ENTERTAINMENT;

SONY PICTURES RELEASING;

COLUMBIA PICTURES;

ROLAND EMMERICH;

 Defendant.

_____/

## COMPLAINT FOR DAMAGES

1

Plaintiff ANDRAY MCWILLIAMS ("Plaintiff") alleges the following against Defendant

CENTROPOLIS ENTERTAINMENT ("Defendant");

COLUMBIA PICTURES ("Defendant");

SONY PICTURES RELEASING ("Defendant");

ROLAND EMMERICH ("Defendant");

## I. INTRODUCTION

### Irreparable harm standard

A sense of looming, irreversible injury pulses through the complaint's narrative, giving shape to the irreparable harm standard as if it were a living force pressing against the plaintiff's world. In the allegations, the plaintiff describes a cascade of damage that cannot be unwound—an erosion of patriotic identity, a distortion of creative vision, and a psychological unraveling sparked by the defendants' alleged conduct. This harm is not the kind that money can mend; it is portrayed as a wound to the mind and spirit, a fracture in the plaintiff's relationship with the symbols and ideals he holds sacred. The complaint paints Centropolis Entertainment as a powerful entity shaping public consciousness, its films allegedly corroding the plaintiff's sense of national meaning and personal purpose. Each broadcast, each cinematic portrayal, is framed as another blow that deepens the injury, pushing it beyond the reach of ordinary remedies. In this dramatized telling, the irreparable harm standard becomes the threshold between survival and collapse—a legal doctrine invoked not as a technical requirement, but as a lifeline, a plea for the court to

intervene before the damage becomes permanent, before the plaintiff's identity dissolves under the weight of the defendants' alleged influence.

This action arises from Defendant's alleged violations of multiple federal statutes relating to terrorism, treason, seditious conspiracy, rebellion, and the advocacy of government overthrow.

Plaintiff asserts that Defendant's motion-picture productions, media activities, and public broadcasts constitute conduct prohibited under various provisions of Title 18 of the United States Code.

Centropolis Entertainment Inc is a business valued at $300 million that targets Americans by creating the emerging film categories that has built and moiled the mind of many Americans." Centropolis Entertainment Inc spends millions of dollars crafting the façade of a company that cares about media, fans, Americans and its customers, with faulty claims that has a rigorous public media system for its Americans to feel secure and falsely guarantees complimentary assurance to its customers about our United States of America Government.  Centropolis Entertainment Inc does nothing to help support Americans from terrorism in certain films that the defendant has public across the international public media markets and does not offer any meaningful assurance to aggrieve patriotism in Americans.

Indeed, the contrast between what Centropolis Entertainment Inc deliveries and what Roland Emmerich does could not be starker.  Centropolis Entertainment Inc coyly brands itself as "Movies of the Century," falsely stating, for example and without limitation, "As you can see from the Centropolis Entertainment Inc logo, the studio is at the center of the world's attention. Fame, universal recognition, and love convey the emblem. The film company creates iconic films that are sold out in theaters and on TV screens." "all Americans are approved by our patriotic team of

films specialists," "Centropolis Entertainment Inc delivers 2 movies with less than 0% of potential patriotic rate," and "instill to the Americas of this country that movies would be a great film and could shape the mind and lifespan of great Americans"

In reality, there was no system in place to vet Americans, and some international film lovers that are "repeat offenders of psychological despair" that have already irresponsibly been led to the death of patriotism in their care.  Centropolis Entertainment Inc's greed to develop its film fan base and please investors have corrupted whatever values led to its inception.

This case is about Centropolis Entertainment Inc's inability to care for the United States White House, an emotional support base of American entrusted to it, the faulty film making of Centropolis Entertainment Inc's that limited Plaintiff's ability to rescue the mind and creativity of what image the plaintiff had for the White House, and Centropolis Entertainment Inc's false advertising of their company.  Plaintiff seeks damages for a litany of Centropolis Entertainment Inc's abuses, not least of which is the harm suffered due to Defendants' negligence, untruthful statements, and callous disregard for the rights of their victims.

In the context of the plaintiff's complaint, Columbia Pictures and Sony Pictures Releasing are identified as the entities responsible for the creation and distribution of the motion picture of White House Down. Columbia Pictures served as the primary production studio, overseeing the development, financing, creative direction, and execution of the film. Sony Pictures Releasing functioned as the distributor, managing the marketing, promotion, and nationwide release of the movie to theaters and other platforms. The plaintiff asserts that through these roles, both entities engaged in conduct that allegedly implicates various federal statutes concerning depictions of

violence against government property, national security concerns, and the portrayal of destructive devices.

The plaintiff's allegations center on the claim that White House Down contains scenes involving the use of missiles, explosives, and other destructive devices directed at the White House and other federal structures. According to the plaintiff, these depictions—although fictional—constitute an irresponsible representation of acts that resemble conduct prohibited under federal law, including statutes addressing destructive devices, terrorism-related activities, and threats against federal property. The complaint asserts that by producing and distributing a film that visually portrays such acts, Columbia Pictures and Sony Pictures Releasing contributed to the normalization of imagery involving attacks on the United States government.

The plaintiff further alleges that the film's narrative, which includes coordinated assaults on federal buildings, could be interpreted as glamorizing or trivializing conduct that federal law strictly prohibits. The complaint frames these depictions as potentially conflicting with statutes such as 18 U.S.C. § 2332b (acts of terrorism transcending national boundaries), 18 U.S.C. § 2332f (bombing of public places and government facilities), and 18 U.S.C. § 844 (use of explosives). The plaintiff claims that the defendants committed these acts in reality on small scales and through planning and implementation of demonstration size effects, but rather that the cinematic portrayal of such conduct raises concerns about the responsible use of media and the potential societal impact of dramatizing attacks on federal institutions.

Additionally, the plaintiff asserts that Sony Pictures Releasing, by distributing the film globally, amplified the reach of these depictions and contributed to their widespread circulation. The complaint argues that the distributor had a duty to consider the implications of releasing a film

containing scenes that simulate attacks on the White House, a symbol of national governance and security.

## II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff alleges violations of federal law. 28 U.S. Code § 1343

Venue is proper in this District because Defendant conducts business in the Central District of California and distributes media within this jurisdiction.

## III. PARTIES

Plaintiff ANDRAY MCWILLIAMS is an individual residing within the State of Florida.

Defendant CENTROPOLIS ENTERTAINMENT is a motion-picture production company responsible for creating and distributing films and related media.

Defendant CENTROPOLIS ENTERTAINMENT INC. ("Defendant") is a California corporation that owns and operates an application and web site, "centropolis.com" Its principal place of business is 10880 Wilshire Blvd. Suite 1000 Los Angeles, CA 90024 USA and it does business nationwide.

Defendant ROLAND EMMERICH, who is also known as "Roland E." ("Defendant"), is an individual who, upon information and belief, resides at 10880 Wilshire Blvd. Suite 1000 Los Angeles, CA 90024 USA.

Defendant SONY PICTURES RELEASING. ("Defendant") is a California corporation that owns and operates an application and web site, "sonypictures.com" Its principal place of business is 10202 Washington Blvd, Culver City, CA 90232 USA and it does business nationwide.

Defendant COLUMBIA PICTURES. ("Defendant") is a California corporation that owns and operates an application. Its principal place of business is 10202 Washington Blvd, Culver City, CA 90232 USA, and it does business nationwide.

## IV. FACTUAL ALLEGATIONS

Plaintiff alleges that Defendant's films and media broadcasts depict, simulate, or promote acts involving terrorism, destruction of government property, and attacks on the United States government.

Plaintiff asserts that Defendant's works influence public perception, exploit terrorism-related themes for economic gain, and have caused Plaintiff psychological distress, confusion, and fear.

Plaintiff alleges that Defendant's media content contributed to mental anguish, including intrusive thoughts, fear of government attacks, and distress related to depictions of the White House being destroyed.

Plaintiff further alleges that Defendant's creative processes and internal operations contribute to what Plaintiff interprets as the normalization or promotion of terrorism-related conduct.

Centropolis Entertainment leadership in Public Media

One Andray McWilliams watched Independence Day a movie that gave the plaintiff nightmares, duress, and stress under the mental capacity to deter; the film reassembles military training in the perspective of terroristic activity.  The film taught the plaintiff how to infiltrate the United States White House and cause harm and pain and suffering to two hundred years of patriotic attainability of law. The film is illegal and irrational not to undermine the significance of our country by putting the video of the white house being exploited or defamed on public air.

As part of a coordinated alien attack, massive alien ships hover over major cities, including Washington, D.C.

President Whitmore (played by Bill Pullman) is warned of an imminent strike after a countdown embedded in satellite signals is decoded

Plaintiff Despite evacuation efforts, it's too late. The alien ship fires a powerful energy beam directly at the White House.

The building is obliterated in a massive explosion, captured in slow motion with stunning practical effects.

The President and key personnel narrowly escape aboard Air Force One as the city is engulfed in flames.

8

Most importantly Behind the Scenes The explosion was achieved using a 1:24 scale model of the White House, about 5 feet tall.

40 explosives were carefully placed inside the model to simulate the blast.

The scene was filmed in slow motion to enhance the dramatic impact.

No CGI was used for the explosion itself—this was a triumph of practical effects

Second Steps In

On June 23, 2013, Defendant used the Centropolis Entertainment's to promote another film called White House Down to find and hire Defendant's employee for terrorist mental activity, while the Plaintiff could not comprehend the aspect of the film because he could not watch the trailer.

Centropolis Entertainment's advertised film trailers for Independence Day and White House Down in their state of California, and internationally on radio, television and word of mouth.

Centropolis Entertainment's Independence Day and White House Down profile advertised that it's had an experience, great suspense, mystery, and was given 5-star rating reviews.

After The chaos begins when a bomb detonates inside the U.S. Capitol, collapsing the rotunda and throwing Washington, D.C. into lockdown

Meanwhile, a paramilitary group infiltrates the White House, taking control of its security systems and launching a coordinated assault.

9

On or as the attackers gain access to the nuclear missile codes, hacker Tyler (Jimmi Simpson) breaches the final firewall and remotely launches a missile targeting Air Force One, killing the Vice President.

The White House itself is heavily damaged during the siege, with explosions, helicopter crashes, and intense gunfights erupting across the grounds.

Visual Effects & Impact - Directed by Roland Emmerich (also known for Independence Day), the film uses a mix of practical effects and CGI to depict the destruction.

The White House lawn, columns, and interior are shown torn apart in dramatic slow-motion sequences.

The scene is a signature Emmerich-style spectacle: explosive, emotional, and visually grand.

A divorced US Capitol Police officer attempts to rescue both his daughter and the President of the United States when a destructive terrorist assault occurs in the White House.

Released on June 28, 2013, by Sony Pictures Releasing, White House Down received mixed reviews from critics with criticism going towards the screenwriting and the clichéd storyline, although the performances and action sequences were praised. The film grossed over $205 million worldwide at the box office, against a budget of $150 million. White House Down was one of two films released in 2013 that dealt with a terrorist attack on the White House; the other, Olympus Has Fallen, was released three months earlier.

White House Down Scene enactment

10

**I'll take you through the movie the way a director would: pacing, tension curves, spatial geography, and the emotional logic behind each escalation.**

**Not a recap, not a summary — a scene-by-scene emotional and visual breakdown of White House Down that feels like you're watching the film unfold in real time.**

The White House tour route was supposed to be harmless — a slow shuffle of tourists, bored teenagers, and camera flashes. But beneath the polished floors and velvet ropes, tension was already coiling like spring. The moment the Capitol Building erupted in a violent blast across the city, the shockwave didn't just shake Washington — it detonated the illusion of safety inside 1600 Pennsylvania Avenue.

Agents lunged for radios. Doors slammed. The air snapped from calm to combat in a heartbeat.

And then the wolves stepped out of the crowd.

They moved with military precision, shedding disguises as they advanced. Weapons came up. Commands barked. The first bursts of gunfire cracked through the corridors like lightning splitting the sky. Tourists screamed. Agents dove for cover. The White House interior — normally a maze of order and ceremony — became a battlefield in seconds.

The attackers swept through the corridors with ruthless efficiency. Boots hammered the floors. Muzzle flashes strobed against marble walls. Every hallway became a funnel of danger. Every corner hid another ambush. The defenders fought back hard, but the assault was coordinated, relentless, overwhelming.

The Blue Room — a chamber built for elegance — erupted into chaos. Gunfire shredded silk drapery. Antique furniture exploded into splinters. Sunlight pouring through the tall windows caught the drifting smoke, turning the firefight into a violent ballet of shadows and sparks. The

11

attackers pushed forward, forcing the defenders to retreat step by step, the room shaking with every impact.

From there, the battle tore through the Residence, the State Floor, and the West Wing corridors. The White House's geography became a tactical war map. The Diplomatic Reception Room turned into a choke point where agents dug in, firing down the hallway as attackers advanced through smoke and debris. The Red Room became a temporary refuge — a place to reload, regroup, and breathe for half a second before the next wave hit. The West Wing, the nerve center of the nation, became a maze of overturned desks, shattered glass, and desperate last stands.

Above all, the rooftop exploded into a storm of chaos. Helicopters roared overhead; their rotors slicing through smoke-filled air. Snipers scrambled for position as explosions rocked the roof beneath their feet. The city stretched out below, helpless to intervene as the White House burned. Every movement on the rooftop was a gamble — exposed, vulnerable, deadly. The sky itself felt hostile, filled with smoke trails and the thunder of engines.

Deep underground, the PEOC bunker thrummed with tension. Steel walls vibrated with distant impacts. The air was thick with urgency as political power collided with raw survival. Down here, the fight wasn't with bullets — it was with strategy, betrayal, and the terrifying knowledge that the attackers were closing in. The bunker felt less like a refuge and more like a pressure cooker ready to burst.

But the final showdown belonged to the South Lawn and the White House façade — the iconic front line of American power. The grounds were torn apart, littered with debris and smoke. Vehicles burned. The air trembled with the force of explosions. The South Portico, scarred and battered, stood like a wounded giant refusing to fall.

The last push was pure chaos. Combatants surged across the lawn. Gunfire echoed off the stone columns. Smoke curled around the façade as the battle reached its peak. Every second felt like the tipping point between collapse and survival. The White House — the People's House — was fighting back through the people defending it, every inch of ground contested with ferocious determination.

When the dust finally began to settle, the White House stood battered but unbroken. Its walls were scorched, its rooms torn apart; its grounds ravaged — but it still stood. The attackers had thrown everything they had at it, and still it refused to fall.

Because the White House is more than a building. It's a battleground that refuses to surrender. And on that day, it proved it.

## V. CAUSES OF ACTION

## RELEVANCE OF FEDERAL BROADCASTING AND COMMUNICATIONS STATUTES

The federal statutes and FCC regulations cited herein are directly relevant to Plaintiff's claims because Defendants' motion-picture productions, media broadcasts, and public dissemination of content fall within the scope of regulated interstate communications. Defendants' conduct implicates federal laws governing unlawful broadcasting, deceptive media practices, unauthorized dissemination of protected content, and the transmission of material that endangers public safety. These statutes establish duties owed by media producers and distributors to the public, including prohibitions against broadcasting false information, inciting criminal activity, distributing dangerous instructional content, airing unauthorized copyrighted material, transmitting deceptive

or fraudulent statements, and violating FCC rules designed to protect consumers, minors, and national security. Defendants' alleged actions, as described in this Complaint, constitute violations of these statutory and regulatory obligations, thereby supporting Plaintiff's causes of action and demonstrating that Defendants' media activities were not merely creative expression but conduct with legal consequences under federal law

Defendants further violated federal broadcasting and communications laws, including 47 C.F.R. § 73.1217 (FCC Hoax Rule) and 47 U.S.C. § 326 (prohibiting broadcasts that incite crime, threaten public safety, or disseminate dangerous content). Defendants' media productions and broadcasts may also constitute Copyright Violations under Title 17 of the United States Code, insofar as Defendants aired, distributed, or publicly broadcast content without possessing the legal rights or authorization to do so. These actions collectively demonstrate unlawful broadcasting practices, deceptive dissemination of media, and violations of federal statutory duties designed to protect the public, safeguard national security, and ensure lawful use of copyrighted material.

## FIRST CAUSE OF ACTION

### 18 U.S.C. § 1361 — Negligent Misrepresentation of Public Policy

(Against All Defendants)

Plaintiff alleges that Defendant's media productions misrepresent matters of public policy by depicting acts of terrorism, destruction of federal property, and attacks on the United States government.

14

Plaintiff cites 18 U.S.C. § 2384 (Seditious Conspiracy) and alleges that Defendant's works portray or simulate conduct involving the overthrow or destruction of the U.S. government.

Plaintiff alleges violations of 18 U.S.C. § 2339A, asserting that Defendant's broadcasts promote terrorism, exploit economic systems, and psychologically harm viewers.

Plaintiff alleges violations of 18 U.S.C. § 2339B, asserting that Defendant's works depict training for terrorism, simulate attacks on the White House, and cause Plaintiff fear, mental anguish, and confusion.

## SECOND CAUSE OF ACTION

### 18 U.S.C. § 2381 — Treason (Intentional Misrepresentation of Public Policy)

(Against All Defendants)

Plaintiff alleges that Defendant's works provide "aid and comfort" to enemies of the United States by portraying attacks on the White House and other government institutions.

Plaintiff alleges violations of 18 U.S.C. § 2339C, asserting that Defendant exploits terrorism themes for economic benefit.

Plaintiff alleges violations of 18 U.S.C. § 2339D, asserting that Defendant's films depict or predict terrorist activity and influence employees and viewers in harmful ways.

Plaintiff cites Section 809 of the USA PATRIOT Act, noting that certain terrorism-related offenses have no statute of limitations.

Plaintiff cites 18 U.S.C. § 2331, referencing statutory definitions of terrorism and acts of war.

## THIRD CAUSE OF ACTION

### 18 U.S.C. § 2385 — Advocating Overthrow of Government

(Against All Defendants)

Plaintiff alleges that Defendant's works advocate, depict, or simulate the overthrow or destruction of the U.S. government by force or violence.

Plaintiff cites statutory provisions prohibiting the publication or distribution of materials advocating government overthrow.

Plaintiff alleges that Defendant's works constitute organizing or encouraging groups that support such conduct.

## FOURTH CAUSE OF ACTION

### 18 U.S.C. § 2383 — Rebellion or Insurrection (Breach of Public Policy)

(Against All Defendants)

Plaintiff alleges that Defendant's media productions incite, assist, or simulate rebellion or insurrection against the authority of the United States.

Plaintiff asserts that Defendant's works violate federal prohibitions on rebellion and undermine public policy.

**FIFTH CAUSE OF ACTION**

**18 U.S.C. § 2332f — Bombings of Public Places and Government Facilities**

(Against All Defendants)

Plaintiff alleges:

Defendant's media productions depict, simulate, or promote acts involving the destruction of government facilities, including portrayals of the White House being bombed or destroyed.

Plaintiff asserts that these depictions constitute the promotion or normalization of conduct prohibited under 18 U.S.C. § 2332f, which criminalizes bombings or attempted bombings of public places, government buildings, and infrastructure.

Plaintiff alleges that Defendant's works create foreseeable psychological harm by presenting such acts as achievable, realistic, or instructive.

As a result, Plaintiff suffered fear, emotional distress, and confusion regarding the safety of government institutions.

**SIXTH CAUSE OF ACTION**

**18 U.S.C. § 1512(c) — Tampering with Evidence or Obstructing an Official Proceeding**

(Against All Defendants)

Plaintiff alleges:

Defendant's media productions and public broadcasts interfere with or obstruct Plaintiff's ability to understand, report, or interpret events involving national security.

17

Plaintiff asserts that Defendant's works create false impressions of real-world events, thereby obstructing Plaintiff's ability to participate meaningfully in legal or governmental processes.

Plaintiff alleges that such conduct constitutes obstruction under 18 U.S.C. § 1512(c), which prohibits corruptly altering, concealing, or influencing information relevant to official proceedings.

Plaintiff suffered confusion, distress, and impairment in understanding matters of public concern.

## SEVENTH CAUSE OF ACTION

### 18 U.S.C. § 2332i — Acts of Nuclear Terrorism

(Against All Defendants)

Plaintiff alleges:

Defendant's films depict or simulate acts involving weapons of mass destruction, including nuclear-type attacks on U.S. government facilities.

Plaintiff asserts that such depictions fall within the scope of 18 U.S.C. § 2332i, which prohibits acts of nuclear terrorism or threats involving nuclear devices.

Plaintiff alleges that Defendant's portrayals create fear, psychological distress, and the belief that such attacks were real or imminent.

Plaintiff suffered mental anguish and fear as a result of these depictions.

## EIGHTH CAUSE OF ACTION

**18 U.S.C. § 2332g — Missiles, Anti-Aircraft Weapons, and Destructive Devices**

(Against All Defendants)

Plaintiff alleges:

Defendant's media productions depict the use of missiles, aircraft-based weapons, and destructive devices aimed at government buildings and aircrafts.

Plaintiff asserts that these portrayals fall within the scope of 18 U.S.C. § 2332g, which prohibits the unlawful use, transfer, or deployment of anti-aircraft missiles and similar weapons.

Plaintiff alleges that Defendant's depictions normalize or promote the use of such weapons against the United States government.

Plaintiff suffered fear, confusion, and emotional distress as a result.

## NINTH CAUSE OF ACTION

**18 U.S.C. § 2332i (Second Count) — Threats or Attempts Involving Nuclear Devices**

(Against All Defendants)

Plaintiff alleges:

Defendant's works repeatedly depict scenarios involving nuclear threats, nuclear detonations, or catastrophic destruction of federal property.

Plaintiff asserts that these portrayals constitute a separate and distinct violation of 18 U.S.C. § 2332i because they involve additional acts, threats, or simulations beyond those described in the Tenth Cause of Action.

Plaintiff alleges that Defendant's repeated use of nuclear-type destruction caused ongoing psychological harm, fear, and confusion.

Plaintiff suffered continuing emotional distress as a result of these repeated depictions.

**TENTH CAUSE OF ACTION**

**Violation of Civil Rights Under 42 U.S.C. § 1983 (Unequal Treatment in Regulation of Harmful Media)**

Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 to challenge the unequal and discriminatory regulatory treatment applied to different categories of harmful media. Federal law and federal regulatory agencies impose strict prohibitions on the advertising and promotion of cigarettes, including bans on televised advertising, mandatory warnings, and restrictions designed to protect public health and prevent harmful influence on consumers.

Plaintiff alleges that Defendants Columbia Pictures, Sony Pictures Releasing, Centropolis Entertainment, and Roland Emmerich (collectively "Defendants") produce and distribute motion-picture content—specifically White House Down—that contains graphic depictions of the destruction of the White House, the use of missiles and explosives against federal buildings, and the kidnapping of the President of the United States. These depictions simulate conduct prohibited under federal criminal statutes, including 18 U.S.C. §§ 2332b, 2332f, and 844.

Plaintiff asserts that the federal government, through its regulatory framework, treats cigarette companies as dangerous influences requiring strict advertising prohibitions, while permitting

movie studios to widely disseminate fictional content that normalizes or glamorizes attacks on federal institutions, destructive devices, and coordinated assaults on government property.

Plaintiff alleges that this disparate regulatory treatment constitutes an arbitrary and discriminatory distinction that violates Plaintiff's civil rights. Plaintiff contends that the government's refusal to regulate or restrict the dissemination of films depicting attacks on the White House—while aggressively regulating cigarette advertising—creates an unequal system that fails to protect the public from harmful influences of comparable or greater magnitude.

Plaintiff further alleges that Defendants' nationwide distribution of White House Down amplifies the reach of these depictions and contributes to their widespread circulation, thereby exposing Plaintiff and the public to harmful portrayals of violence against the United States government without the safeguards imposed on other harmful industries.

Plaintiff asserts that this unequal treatment violates the principles of equal protection embodied in the Fifth Amendment's Due Process Clause, as incorporated through 42 U.S.C. § 1983, by permitting one category of harmful media to be strictly regulated while allowing another category—depictions of violent attacks on federal institutions—to remain unregulated despite comparable risks to public welfare.

 As a result of this discriminatory regulatory disparity, Plaintiff has suffered psychological harm, loss of patriotic trust, and emotional distress arising from exposure to Defendants' unregulated depictions of violence against the United States government.

Plaintiff seeks declaratory relief, injunctive relief, and any other remedies the Court deems just and proper.

## VI. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

WHEREFORE, Plaintiff Andray McWilliams prays for judgment against Defendants Centropolis Entertainment Sony Pictures Releasing, Columbia Pictures and Roland Emmerich as follows:

(a) Compensatory Damages: For emotional distress damages in the amount of $100,000, to be placed into a disability account for Plaintiff's daily living expenses and medical care necessitated by the conduct of Defendants.

(b) Remedial & Punitive Damages (The Buy-Back Program): In the amount of $75,000,000 to be specifically allocated toward a mandatory "National Security Media Recovery Program" and other Public Safety Concerns. Plaintiff requests the Court order these funds be used and invested to:

   a. Purchase and recover all existing physical copies (DVD, Blu-ray, and other media) of the films Independence Day and White House Down from the public market and private distributors.

   b. Fund the permanent destruction of said physical copies to prevent further "paramilitary training" or psychological harm to the American public.

   c. Fund the removal of these titles from digital streaming platforms to abate the ongoing "cyberterrorism" and "mental anguish" alleged in this complaint.

   d. Fund other Public Safety Commitments.

22

(c) Declaratory Relief: An order requiring the Defendants to issue a formal, written apology letter to the United States of America for the depiction of the destruction of the White House and the alleged promotion of insurrectionist themes.

(d) Injunctive Relief: A permanent injunction restraining Defendants from producing or distributing further media content that depicts the destruction of United States federal government buildings or provides simulated "training" for terroristic activities.

(e) Attorneys' Fees: For costs and fees incurred herein pursuant to the causes of action and the interests of justice.

(f) Costs of Suit: For interest, expenses, and costs of suit to the extent permitted by law.

Other Relief: For such other and further relief as the Court may deem just and proper.

DATED: January 21, 2026
Andray McWilliams

By: _____

Plaintiff, Pro Se:
Andray McWilliams
12570 US HWY 441
SUITE 624
CANAL POINT, FL 33438

**PLAINTIFF'S SUPPORTING MEMORANDUM REGARDING NATIONWIDE RELIEF**

*(Local Rule 83-11 — Request to Bar the Challenged Scenes Nationwide)*

Plaintiff **Andray McWilliams** respectfully submits this Supporting Memorandum in connection
with the filing of a Notice of Nationwide Relief pursuant to **Local Rule 83-11**.

## I. INTRODUCTION

This action challenges Defendant **Centropolis Entertainment, Sony Pictures Releasing,
Columbia Pictures, and Roland Emmerich's** creation, distribution, and public broadcast of
certain motion-picture scenes and media content that Plaintiff alleges violate multiple federal
statutes relating to terrorism, treason, seditious conspiracy, rebellion, and advocacy of government
overthrow. Plaintiff asserts that these scenes and productions have been disseminated across
national and international markets and have caused widespread harm to American patriotism,
public perception, and national security interests.

Because the challenged conduct involves **nationwide distribution of films and media**, and
because Plaintiff seeks relief that would **bar the continued dissemination of these scenes across
the United States**, this case necessarily seeks **nationwide declaratory and injunctive relief**.

Accordingly, Local Rule 83-11 applies.

## II. THE RELIEF SOUGHT IS NATIONWIDE IN SCOPE

Plaintiff alleges that Centropolis Entertainment, Sony Pictures Releasing, Columbia Pictures, and
Roland Emmerich's film and scenes are distributed **throughout the United States and
internationally**, reaching millions of viewers and influencing public sentiment on a national scale.
Plaintiff contends that these scenes:

- Promote or normalize conduct prohibited under federal criminal statutes
- Undermine patriotic sentiment and public trust in the United States government
- Cause psychological and cultural harm to American audiences
- Are disseminated through national media channels, theaters, and streaming platforms

Because the alleged harm arises from **nationwide distribution**, the remedy must likewise be
**nationwide**. A geographically limited injunction would not prevent the continued circulation of
the challenged scenes in other states, nor would it fully redress the injuries Plaintiff alleges.

Thus, Plaintiff seeks an order **barring the continued distribution, broadcast, or publication of the challenged scenes nationwide**.

## III. LOCAL RULE 83-11 REQUIRES NOTICE WHEN NATIONWIDE RELIEF IS SOUGHT

Local Rule 83-11 requires parties to provide notice when a case seeks declaratory or injunctive relief that would bar or mandate enforcement of a state or federal law on a **statewide or nationwide basis**.

Here, Plaintiff seeks:

- A declaration that Defendant's conduct violates federal law
- An injunction prohibiting further distribution of the challenged scenes across the United States

Because the requested relief would apply **beyond the parties** and would affect **national media distribution**, Plaintiff has filed a Notice of Nationwide Relief in compliance with Local Rule 83-11.

## IV. NATIONWIDE RELIEF IS NECESSARY TO FULLY REMEDY THE ALLEGED HARM

Plaintiff alleges that Centropolis Entertainment, Sony Pictures Releasing, Columbia Pictures, and Roland Emmerich's films and scenes have been disseminated across the country and have influenced the minds, perceptions, and patriotism of American viewers nationwide. Plaintiff further asserts that the Defendant's media activities have caused:

- Cultural and psychological harm
- Erosion of patriotic sentiment
- Misrepresentation of American values
- Public deception through false advertising and branding practices

Because the alleged harm is **not confined to a single jurisdiction**, a limited injunction would be ineffective. Only a **nationwide bar** on the challenged scenes can prevent continued injury and ensure that the unlawful conduct does not persist in other states.

**V. CONCLUSION**

Plaintiff seeks declaratory and injunctive relief that would **bar the continued distribution and broadcast of the challenged scenes nationwide**. Because the relief sought extends beyond the parties and would have nationwide effect, Plaintiff has filed the required Notice under Local Rule 83-11.

Nationwide relief is appropriate, necessary, and consistent with the scope of the alleged harm.

DATED: January 21, 2026

Andray McWilliams

By:

Plaintiff, Pro Se:

Andray McWilliams

12570 US HWY 441

SUITE 624

CANAL POINT, FL 3343

✎AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

CENTRAL _____ DISTRICT OF _____ CALIFORNIA

**EXHIBIT AND WITNESS LIST**

V.

CE, SPR, CP, RE

Case Number:

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY<br>PRO SE | DEFENDANT'S ATTORNEY |
|---|---|---|
| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| 1 | | | | | 1 PAGE 1-18 IMAGES FROM THE MOVIE WHITE HOUSE DOWN |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

Page 1 of ____1____ Pages





© 2013 Jamie Foxx

| U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA | |
| --- | --- |
| CASE NO. N/A | |
| ANDRAY MCWILIAMS | |
| VS. CE, SPR, CP, RE | |
| PLAINTIFF'S EXHIBIT 1 PAGE 1 | |
| DATE 1/21/2026 | IDEN. |
| DATE | EVID. |
| BY | |
| Deputy Clerk | |





U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A _____

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE _____

PLAINTIFF'S EXHIBIT 1 PAGE 2 _____

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____
       Deputy Clerk





© Sony Pictures Entertainment

U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 3

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____
Deputy Clerk





U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 4

DATE 1/21/2026                         IDEN.

DATE _____EVID.

BY _____
            Deputy Clerk





U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 5

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____
Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 6

DATE 1/21/2026 IDEN.

DATE EVID.

BY

Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 7

DATE 1/21/2026                    IDEN.

DATE                              EVID.

BY

Deputy Clerk





© Sony Pictures Entertainment

U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 8

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____
Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A _____

ANDRAY MCWILIAMS _____

VS. CE, SPR, CP, RE _____

PLAINTIFF'S EXHIBIT 1 PAGE 9 _____

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____
Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A _____

ANDRAY MCWILIAMS _____

VS. CE, SPR, CP, RE _____

PLAINTIFF'S EXHIBIT 1 PAGE 10 _____

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____

Deputy Clerk







U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 11

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____
         Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 12

DATE 1/21/2026                        IDEN.

DATE                                  EVID.

BY

Deputy Clerk





U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. __N/A__

ANDRAY MCWILIAMS

VS. __CE, SPR, CP, RE__

PLAINTIFF'S EXHIBIT __1 PAGE 13__

DATE __1/21/2026__ _____ IDEN.

DATE _____ EVID.

BY _____
             Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. _N/A_____

ANDRAY MCWILIAMS

VS. _CE, SPR, CP, RE_____

PLAINTIFF'S EXHIBIT _1 PAGE 14_____

DATE _1/21/2026_____IDEN.

DATE _____EVID.

BY _____
          Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 15

DATE 1/21/2026 IDEN.

DATE EVID.

BY
Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 16

DATE 1/21/2026                              IDEN.

DATE                                        EVID.

BY

Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A _____

ANDRAY MCWILIAMS _____

VS. CE, SPR, CP, RE _____

PLAINTIFF'S EXHIBIT 1 PAGE 17 _____

DATE 1/21/2026 _____ IDEN.

DATE _____ EVID.

BY _____
          Deputy Clerk



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

CASE NO. N/A

ANDRAY MCWILIAMS

VS. CE, SPR, CP, RE

PLAINTIFF'S EXHIBIT 1 PAGE 18

DATE 1/21/2026                    IDEN.

DATE                              EVID.

BY

Deputy Clerk